938 P.2d 474

**VALENCIA ENERGY COMPANY,**
**Plaintiff–Appellant,**

v.

**ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellee.**

**No. 1 CA–TX 94–0015.**

Court of Appeals of Arizona, Division 1, Department T.

Sept. 12, 1996.

Review Granted July 1, 1997.

Grant Woods, Attorney General by James M. Susa, Assistant Attorney General, Phoenix, for Defendant-Appellee.

Newmark Irvine, P.A. by Stephen C. Newmark, Phoenix, and Ulrich & Kessler, P.C. by Paul G. Ulrich, Phoenix, and Law Office of Hartley Newkirk by Hartley Newkirk, Tucson, and Walker, Ellsworth, P.L.C. by Frank L. Migray, Phoenix, for Plaintiff-Appellant.

LANKFORD, Presiding Judge.

Following a transaction privilege (sales) tax audit for the period between November 1985 and March 1990, the Department of Revenue ("DOR") concluded that Valencia Energy Company owed $4.98 million in taxes plus interest. Valencia succeeded only in part when it administratively challenged the assessment of back taxes, so it appealed to the tax court. In a published opinion, the tax court granted summary judgment in favor of DOR, upholding the assessment of back taxes and interest. *Valencia Energy Co. v. Arizona Dep't of Revenue*, 178 Ariz. 251, 872 P.2d 206 (Tax 1994). Valencia timely appealed.

Valencia presents four issues on appeal:

1. Are Valencia's coal transportation and coal handling business activities taxable as incidental to its retail coal sales?

2. Is DOR estopped from assessing back taxes against Valencia because a DOR agent had advised that revenue from coal transportation and handling was not taxable?

3. Should DOR's new interpretation of the tax as applied to Valencia's retail coal sales be enforced prospectively only?

4. Was Valencia entitled to exclude freight costs from its taxable revenue?

We have appellate jurisdiction pursuant to Ariz.Rev.Stat. Ann. ("A.R.S.") section 12–2101(B) (1994). We affirm.

Our review of a summary judgment is de novo. *United Bank of Ariz. v. Allyn*, 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App. 1990). The tax court's entry of summary judgment was proper if the record reveals no genuine dispute of material fact and if, based on the undisputed facts, DOR was entitled to judgment as a matter of law. *Pritchard v. State*, 163 Ariz. 427, 433, 788 P.2d 1178, 1184 (1990).

## I.

We first address whether Valencia's coal transportation and coal handling activities were nontaxable services. We hold that both the transportation and handling of coal were taxable activities.

### A.

We begin by discussing Valencia's activities in supplying coal. Valencia entered into contracts with Alamito Company, the owner of one unit of the Springerville Generating Station, a coal-fired electric power plant located in Arizona. Valencia contracted to purchase, transport, handle and store coal for burning. The agreement, entitled "Fuel Burn Agreement," required Valencia to supply Alamito "all fuel required in and for the operation" of Alamito's power generating unit. Alamito purchased the coal "as delivered" to its Springerville facility.

Valencia obtained the coal from mines in New Mexico. The cost of coal accounted for half or more of Valencia's total costs. The remainder of its costs included transportation and handling of the coal. Valencia computed the amount of sales tax due Arizona based only on the amount it paid for the coal, excluding revenue it attributed to its transportation and handling of the coal.

The Valencia–Alamito contract provided for an initial price of $54 per ton. The parties agreed to review the price annually and to attempt to negotiate price adjustments. If negotiations failed, the parties agreed, binding arbitration would fix the price.[1]

Valencia sent monthly invoices. The invoices indicated the quantity of coal, the price per ton, and the resulting total sales price. Valencia produced affidavits in the trial court stating that the invoice prices were based on "tariff sheets" showing Valencia's component costs in providing the coal, including the coal, transportation, and a "management fee" of $1.25 per ton. However, Valencia's evidence failed to explain how this description of the pricing method comported with the contract, which provided for a price of $54 per ton and annually negotiated adjustments.[2]

In any case, Alamito contracted to purchase "as delivered" coal, and Valencia invoiced the coal in this manner. Neither the parties' contract nor Valencia's invoices provided for separate charges to Alamito for the coal and its transportation, processing, testing, handling and storage.

### B.

■ Was Valencia obligated to pay sales taxes on the full amount it charged Alamito, or only on the amount it paid for the coal? We conclude that Valencia was obligated to pay Arizona sales tax based on the full amount it charged Alamito, not merely on the amount Valencia paid for the coal.

Arizona imposes a "transaction privilege tax" on "the volume of business transacted by persons on account of their business activities...." A.R.S. § 42–1306(A) & (C) (1991).[3] Among other activities, the tax ap-

---

1. The arbitrators were directed to consider a number of factors in setting a price, including: (1) the price of coal; (2) the charges paid the Atchison, Topeka and Santa Fe Railroad; (3) the cost of leasing and maintaining the Springerville and Coronado rail lines; (4) the cost of maintenance of the ash handling facilities and the coal storage and handling facilities; (5) the cost of ash disposal; and (6) a charge for services performed by Valencia at the power plant relating to storage and handling of coal.

2. The parties may have modified their original agreement, performed the original agreement in this way, or simply not followed the agreement: The record is simply unclear on this point.

3. The current versions of the applicable statutes were not in effect during the entire audit period in this case, but all the provisions applicable at any point in this case were virtually identical in substance. For simplicity, this opinion cites the versions currently in effect.

plies to "the business of selling tangible personal property at retail." A.R.S. § 42–1310.01(A) (Supp.1995). The tax base for the sale of retail goods is "the gross proceeds of sales or gross income derived from the business." *Id.*

Valencia contends that its tax should be based on what it paid the mines for coal, not on the price at which it sold the as-delivered coal to Alamito. The first difficulty with this approach is a fundamental conceptual one: The transaction privilege tax is imposed on Valencia's *gross receipts from sales,* not its *cost of purchasing materials.* Valencia's argument focuses on the wrong transactions—its purchases of coal.

The second problem with Valencia's argument is a practical one. Valencia asks that the tax be calculated based on the costs of coal because it did not separately price the sale of coal and the related services. The process of calculation, however, is itself uncertain, complex and burdensome for the tax collector. The impracticability of this method of computing the tax argues strongly against it.

The difficulty is that the price of a typical product sold at retail includes much more than the costs of the raw materials used to produce it. The price also includes other costs of production, including labor and capital equipment. It includes administrative and other overhead costs and, of course, profit.[4]

Valencia's proposal requires either of two unacceptable practices. First, the tax could be computed on the cost of coal alone. By omitting the other factors in the retail price, this approach would substantially understate the price and thus understate the taxpayer's liability. Secondly and alternatively, the tax could be computed by adding the cost of coal to overhead, profit and other components of a retail price. To verify that amount, however, the tax collector would face a Herculean task. Instead of examining one set of books—Valencia's sales records—the tax au-

thority would have to examine the gamut of taxpayer's financial records. What were the taxpayer's overhead, profit, labor and capital costs? Moreover, the tax collector would be forced to answer difficult, subjective questions which the taxpayer might easily choose to dispute and litigate. For example, what portion of the taxpayer's profit or overhead is attributable to its materials costs, and what portion to its other costs?

■ Even in the best case, Valencia's approach is impracticably burdensome. The practicality, efficiency and convenience of administrative enforcement is taken into consideration by courts when interpreting tax statutes. 3A Norman J. Singer, Sutherland Stat. Const. § 66.06 at 33 (5th ed.1992).

■ Valencia nevertheless argues that transportation and handling of the coal are not taxable because they involve the sale of a service, not of personal property. "Services rendered in addition to selling tangible personal property at retail" are not subject to the sales tax. A.R.S. § 42–1310.01(A)(2). On the other hand, the tax base for the sales tax derives from the gross proceeds of the sale of the retail good. A.R.S. § 42–1310.01(A). " 'Gross proceeds of sales' means the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of ... *expense of any kind....* " A.R.S. § 42–1301(5) (Supp.1995) (emphasis added).

By statute, Valencia cannot avail itself of the exception for services. Simply put, Valencia cannot reduce the amount of gross sale proceeds by the amount attributable to services because it failed to keep separate sales records. A.R.S. section 42–1310.01(H) provides:

If a person is engaged in an occupation or business to which subsection [the services exception] applies, the person's books shall be kept so as to show separately the gross proceeds of sales of tangible property and the gross income from sales of

---

4. We recognize that in this case, the only production processes involved were the testing and crushing of the coal. We also acknowledge that there was evidence that Valencia made no profit in this contract. However, our other observations apply. Moreover, we must consider what is workable as a general rule. There is no warrant for fashioning a special rule of taxation for Valencia alone.

services, *and if not so kept the tax shall be imposed on the total of the person's gross proceeds of sales of tangible personal property and gross income from services.*

(Emphasis added).

The exception does not apply because Valencia did not keep separate sales records. Its contract and its invoices all priced "as-delivered" coal: i.e., coal and the related transportation and other services were sold together for a single amount per ton. Although Valencia points to its records of coal *purchases* as separate records, those are not the records of the relevant transactions, which are the *sales*. Valencia's argument is no more than that a hypothetical separate retail price for coal can be constructed from Valencia's purchase records. We think it plain that this is not what the Legislature intended when it required taxpayers to keep separate books of sales of goods and services.[5]

Valencia relies on two prior cases, but we do not believe that these decisions apply here. In the first case, the supreme court held that the taxpayer's services as a purchasing agent were not included in its gross receipts from the contracting business. *Ebasco Services Inc. v. Arizona Tax Comm'n,* 105 Ariz. 94, 459 P.2d 719 (1969). This case principally involved the meaning of "gross receipts," not whether an exception to gross receipts applied. The court held that because the contractor acted as a purchasing agent, it did not sell the equipment to the owner. *Id.* at 96, 459 P.2d at 721. Accordingly, the owner's payments for the equipment were not taxable "gross receipts." The court also stated that engineering and design services were not part of the taxable contracting business. *Id.* at 98, 459 P.2d at 723. However, the taxpayer had entered into separate contracts for construction and for engineering services. *See Arizona Tax Comm'n v. Holmes & Narver, Inc.,* 113 Ariz. 165, 168, 548 P.2d 1162, 1165 (1976). Because the case at hand involves no separate books of sales

and no separate contracts, *Ebasco* does not apply.

The second decision on which Valencia relies is *Holmes, supra.* That case also involved whether engineering services constituted gross receipts from contracting. The supreme court held that the taxpayer need not have had separate contracts if it had "separately accounted[ed] and bill[ed] for design and engineering and construction services." *Holmes,* 113 Ariz. at 168, 548 P.2d at 1165. A prerequisite to avoidance of a tax on the entire contract was that "it can be readily ascertained without substantial difficulty which portion of the business is for nontaxable professional services...." *Id.* at 169, 548 P.2d at 1166. Although the court referred to the taxpayer's records as reflecting its "costs," the contract was "a cost plus fixed fee contract...." *Id.* Thus, the taxpayer's records reflected the sales price for its services and not merely its costs.

*Holmes* does not apply here. Valencia did not maintain separate sales records. It neither entered into separate sales contracts nor billed separately for goods and services. Its records of costs cannot—as we discussed above—permit the tax collector to "readily ascertain[ ] without substantial difficulty" the portion of sales representing services.

Our view is strengthened by a Missouri decision, *Southern Red–E–Mix Co. v. Director of Revenue,* 894 S.W.2d 164 (Mo.1995). That court did not have the benefit of the Arizona statute which expressly requires that the taxpayer maintain separate books. Nevertheless, the court held that the entire sales price of delivered, ready-mix concrete was taxable. It emphasized that, unlike other cases in which services had been held not taxable, the concrete seller had not billed separately for transportation services. *Id.* at 166, 167 (citing *Kurtz Concrete, Inc. v. Spradling,* 560 S.W.2d 858 (Mo.1978) and *Brinson Appliance, Inc. v. Director of Revenue,* 843 S.W.2d 350 (Mo.1992)). Moreover, the court

5. Valencia might have been able to avoid taxation of the services by selling coal separately from the services. However, the fact that a taxpayer might have been able to reduce its tax liability by structuring its transactions differently, but failed to do so, is no ground for relief. *See*

*Brink Elec. Const. Co. v. Arizona Dep't of Revenue,* 184 Ariz. 354, 362, 909 P.2d 421, 429 (App. 1995). We do not suggest, however, that Valencia would avoid the tax by structuring its transactions differently; we have not reached that question.

flatly rejected the argument, made here by Valencia, that a charge for the services could be identified from cost records. *Red–E–Mix*, 894 S.W.2d at 168.

As the Arizona Tax Court noted, Valencia was not in the business of simply selling coal; rather, it was in the business of selling "ready-to-burn coal." *Valencia*, 178 Ariz. at 255, 872 P.2d at 210. Valencia did not contract, bill or account separately for the coal and the services of processing, transporting and storing it. Under the circumstances, section 42–1310.01(H) requires that Valencia's gross receipts be taxed without exception.

Although we employ different reasoning, we conclude that the tax court correctly held that Valencia's entire proceeds were subject to taxation.

## II.

■ The second issue presented by Valencia is whether DOR is estopped from assessing back sales taxes against Valencia. A DOR agent had advised that Valencia's revenue from coal transportation and handling was not taxable. We affirm the tax court's decision that estoppel is not available under the facts of this case.

Valencia presented evidence that it was informed by Gerald Deemer, a tax analyst with DOR, that Valencia would not be required to pay sales tax on that part of its revenues deriving from transportation of the coal. After meeting with representatives of the owners of the power plant, Deemer wrote them a letter indicating that only the purchase of the coal was taxable.

Because Deemer's letter did not address whether the sales tax applied to another product sold by Valencia to Alamito—oil used for flame stabilization—the owners of the power plant asked for clarification. Deemer's response referred to "additional information concerning the degree of nexus Valencia Energy Co. has with Arizona." Based presumably on this additional information, Deemer then advised that revenues from transporting the coal were taxable.

Now concerned about Deemer's conclusion that the transportation costs were taxable, the owners of the power plant contacted Deemer again and asked him to revisit it. Deemer's return letter was worded identically to his second letter except that it deleted "Transportation" from the list of taxable line items and included "Transportation—Title passes in New Mexico" among the "remaining line items" that would not be subject to tax.

Valencia also provided evidence that it relied to its detriment on Deemer's opinion: Valencia had failed to collect sales taxes on the full price charged to Alamito because of Deemer's advice.

This Court recently discussed the availability of estoppel against DOR in *PCS, Inc. v. Arizona Dep't of Revenue*, 186 Ariz. 539, 925 P.2d 680 (App. 1995). In doing so, we resolved against Valencia's position most of the arguments it now presses. In *PCS* we held that Ariz. Const. Art. 9, section 1, *Crane Co. v. Arizona State Tax Comm'n*, 63 Ariz. 426, 163 P.2d 656 (1945), *overruled on other grounds*, *Duhame v. State Tax Comm'n*, 65 Ariz. 268, 179 P.2d 252 (1947), and *Duhame v. State Tax Comm'n*, *supra*, prevent DOR from being equitably estopped by its incorrect representations that the tax did not apply.

We distinguished *Freightways, Inc. v. Arizona Corp. Comm'n*, 129 Ariz. 245, 630 P.2d 541 (1981), on which Valencia relies, because it was not a tax case and "did not implicate article 9, section 2 [sic, 1] of the Arizona Constitution or the concerns for the revenue expressed in *Crane* and *Duhame*." *PCS*, 186 Ariz. at 544, 925 P.2d at 685. We distinguished *Tucson Electric Power Co. v. Arizona Dep't of Revenue*, 174 Ariz. 507, 851 P.2d 132 (App.1992), on which Valencia extensively relies, on the ground that it permitted estoppel only as to representations concerning the procedures for claiming tax benefits that the taxpayer was entitled to receive as a matter of substance.

Like the taxpayer in *PCS*, Valencia rests its estoppel argument on a DOR agent's prior incorrect representations that Valencia's activities were not subject to the tax. *PCS* forecloses this argument.

## III.

The next issue is whether our interpretation of the tax as applied to Valencia's retail coal sales should not be enforced against Valencia, but instead applied prospectively only. We find no reason to do so.

Arizona courts have discretionary authority in extraordinary circumstances to prospectively apply holdings affecting taxation. *E.g., Southern Pac. Co. v. Cochise County*, 92 Ariz. 395, 407, 377 P.2d 770, 778 (1963); *Arizona Tax Comm'n v. Ensign*, 75 Ariz. 376, 377, 257 P.2d 392, 392–93 (1953). We have characterized such actions as based on "fairness." *People of Faith, Inc. v. Arizona Dep't of Revenue*, 171 Ariz. 140, 152, 829 P.2d 330, 342 (App.1992).

Some cases state that "in tax matters, when a previous decision is overruled, the new decision is given prospective effect only." *City of Tempe v. Del E. Webb Corp.*, 14 Ariz.App. 228, 229, 482 P.2d 477, 478 (App.1971) (citing *Duhame v. Arizona Tax Comm'n*, 65 Ariz. 268, 179 P.2d 252 (1947); *Arizona Tax Comm'n v. Ensign*, 75 Ariz. 376, 257 P.2d 392 (1953); *Southern Pac. Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963)). There is also authority for the idea that the preference for prospectivity in tax matters also applies to administrative interpretations that are changed or overruled. *Southern Pac. Co. v. Cochise County*, 92 Ariz. at 407, 377 P.2d at 778.

In this case, however, we do not overturn any previous authority. We apply a statute, section 42–1310.01(H), to reach a legislatively mandated result. No administrative interpretation is overruled.[6] Accordingly, we decline to exercise our discretion to apply the tax prospectively.

## IV.

The final issue is whether Valencia was entitled to exclude freight costs from its taxable revenue. We hold that the freight cost exemption is inapplicable.

A.R.S. section 42–1302(A)(2) excludes from the gross proceeds of a sale of a retail good:

Freight costs billed to and collected from a purchaser by a retailer for tangible personal property which, upon order of the retailer, is shipped directly from a manufacturer or wholesaler to the purchaser.

Valencia asserts that the term "directly" in subsection (A)(2), which is undefined, is ambiguous in the context of this case. It argues that the term should be interpreted in accordance with the federal law principle that "interstate commerce continues until it reaches the point where the parties originally intended that the movement should end," citing *Southern Pac. Co. v. Arizona*, 249 U.S. 472, 39 S.Ct. 313, 63 L.Ed. 713 (1919). We disagree.

"Words and phrases shall be construed according to the common and approved use of the language." A.R.S. § 1–213 (1995). "Directly" means "in a direct manner." *Webster's New Collegiate Dictionary* 320 (G. & C. Merriam Co.1980). *Webster's* first definition of "direct" is "proceeding from one point to another in time or space without deviation or interruption: STRAIGHT." *Id.*

The coal Valencia ultimately sold Alamito went from the mines in New Mexico to Valencia's agents in that state, who shipped it to Valencia's own leased premises at Alamito's plant in Springerville. Valencia then unloaded it, crushed it with machinery that it leased, and only then turned it over to Alamito. In ordinary speech, one would not say that this coal was shipped "directly" from the mines in New Mexico to Alamito in Springerville. The tax court correctly held that Valencia was not entitled to exclude its freight costs from its sales tax base.

---

**6.** We are not unmindful that ·a DOR employee advised Valencia that only some of its gross receipts were taxable. However, DOR has no authority to waive taxes. *See, e.g., PCS*, 186 Ariz. at 543–544, 925 P.2d at 684–685. Also, no evidence showed that this agent's opinion represented an administrative interpretation by DOR. Moreover, part of the agent's advice—applying the use tax rather than the transaction privilege tax—was patently and grossly erroneous and not worthy of any reliance. Nor was the agent's advice accompanied by any statutory citations or analysis. Finally, Valencia's argument is functionally equivalent to a claim of estoppel, a claim we have rejected.

The judgment is affirmed. The opinion of the tax court, reported at 178 Ariz. 251, 872 P.2d 206, is vacated.

KLEINSCHMIDT and SULT, JJ., concur.